**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 18 CR 286** |
| | ) | |
| **XAVIER ELIZONDO** | ) | |
| **and DAVID SALGADO** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Xavier Elizondo and David Salgado, both of whom are Chicago police officers, are charged under 18 U.S.C. § 371 with conspiracy to violate 18 U.S.C. § 666(a)(1)(A) by stealing, embezzling, obtaining by fraud, or converting money under the control of the Chicago police department, which receives federal funding, and under 18 U.S.C. § 641 with theft of money belonging to the United States. Salgado is also charged under 18 U.S.C. § 1001(a)(2) with making a material false statement in a matter within the jurisdiction of the Federal Bureau of Investigation.

The indictment alleges, with respect to the conspiracy charge, that Elizondo and Salgado agreed to steal and misapply money and controlled substances recovered during searches they conducted as police officers. To carry this out, the indictment alleges, they submitted false "J. Doe" warrant applications to state court judges; caused persons posing as Doe informants to provide false information in support of the warrant applications in return for a promise of part of the property to be seized; stole and converted property recovered during the resulting searches; gave part of it to the Doe informants; and submitted false police reports to conceal the scheme.

During its investigation, the government obtained a court order authorizing the interception of communications over Elizondo's cellular telephone. The interception was authorized by Judge Ruben Castillo, this district's chief judge, under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2518(3). Title III authorizes wiretaps for certain enumerated federal offenses, as well as for conspiracy to commit an enumerated offense. *See id.* § 2516(1). Neither section 666 nor section 641 are among the offenses listed in section 2516(1). In support of the intercept application, the government alleged that there was probable cause to believe that the interception would uncover evidence of narcotics offenses under 21 U.S.C. §§ 841(a)(1), 843, and 846, and wire fraud in violation of 18 U.S.C. § 1343.

Elizondo has moved to suppress evidence obtained via the Title III interception. First, he argues that the government's citation of the narcotics and wire fraud statutes was a subterfuge and that the investigation was in fact focused on offenses not enumerated within Title III. Second, Elizondo argues that the application misleadingly failed to disclose, among other things, that certain of the supporting information came from a person whom Elizondo had previously investigated and arrested, which if disclosed would have shown the information was tainted. Third, Elizondo contends that the application did not adequately establish necessity, i.e. that normal investigative procedures had failed or were unlikely to succeed. And fourth, Elizondo argues that the application did not support a finding of probable cause.

The Title III application, dated January 30, 2018, was supported by an affidavit executed by FBI agent Marc Recca. Recca stated that the FBI was investigating allegations that Elizondo and Salgado were engaged in a scheme to steal and

2

embezzle narcotics and money recovered during searches they conducted as police officers, and to provide false information to judges to obtain warrants as a means to obtain property. Recca stated that a confidential source advised the FBI that a named individual ("Individual A"), an informant for the Chicago police department, had received from police officers controlled substances and cash seized during searches in return for tips regarding potential search locations. Recca stated that Individual A had at least seven prior felony narcotics convictions, two of which (from 2010 and 2016) Recca described specifically.

Recca next described a series of events in December 2017. The government's source met with Individual A, Elizondo, and another officer believed to be Salgado and provided them with information about a purported stash house. In fact this was an apartment occupied and monitored by FBI agents. Elizondo promised to give Individual A a cut of whatever proceeds the officers recovered, and Individual A said this would be cocaine or money. Salgado then submitted a false affidavit to a judge to obtain a warrant to search the apartment, after the source (at the agents' direction) refused to appear before the judge. The search was executed on December 20, 2017 and resulted in recovery of $15,000 in cash that the FBI had hidden in the apartment. The officers, however, also discovered hidden video recording equipment (which the FBI had installed). On December 28, Elizondo spoke with the source and told him they were inventorying the $15,000 because they felt they were under surveillance, saying that it would have been a "good Christmas for everybody."

Recca reported in his affidavit that a review of data obtained via a court-ordered pen register identified dozens of contacts (including missed calls) between Elizondo's

cell phone and Individual A's phone over the one-week period after the execution of the search warrant. He stated that Elizondo had used the targeted phone to communicate with the source and Individual A in connection with the search, and to have the December 28 conversation. Based on this and other evidence, Recca said, he expected that Elizondo would continue to communicate using the phone with Individual A, Salgado, and others concerning searches and distributing the proceeds of the searches.

Recca went on to describe other information uncovered during the government's investigation. First, he stated the investigation started in November 2017, when the source told agents that he knew a man, later identified as Individual A, who worked as a police informant. The source reported that Individual A had said the officers gave him a cut of any money recovered in searches for which he provided information and that once they allowed him to keep a quantity of narcotics he had purchased at the direction of officers. Individual A also said that the officers would give him and the source kilogram quantities of narcotics if large quantities were recovered as a result of information they provided. In a lengthy, small-type footnote, Recca stated that the source had prior felony convictions, the most recent of which he described; was not facing current charges; had been and was being compensated for information (a total just over $30,000); and had consistently provided reliable information.

According to Recca, Individual A also described a search in which Chicago police officers told him they seized two handguns, a bulletproof vest, $300 in cash, and narcotics. They gave Individual the cash rather than inventorying it. Recca said this corresponded to police records regarding a search on October 21, 2017 executed by

Elizondo and others after which officers inventoried two handguns, a bulletproof vest, and narcotics, but no cash. Individual A described another search on which he had assisted in which officers seized PCP from a residence. Before the search, the officers gave him money to buy PCP from the target. The officers let Individual A keep the PCP that he purchased. Recca reported that this corresponded with police records regarding a search on October 17, 2017 carried out by Elizondo and others, in which the police report stated officers had witnessed activity at the residence consistent with drug sales but did not document a controlled narcotics purchase.

Recca further stated that the government's source had recently seen a contact in Individual A's cell phone listed as "them people," with the number for Elizondo's cell phone. Data obtained via a pen register revealed 65 contacts between Individual A's phone and Elizondo's between December 5 and 10, 2017. Recca also stated that in November-December 2017, the source had placed consensually recorded calls to Individual A in which they discussed the possibility of introducing the source to police officers to provide them with information, with Individual A saying the source would get part of any money recovered from resulting searches. This, Recca said, generally corroborated the source's reports to the FBI about Individual A.

Recca's affidavit went on to state that under Chicago police department rules, confidential informants who receive monetary compensation are required to be registered. A search of department files conducted by an internal affairs division officer turned up no record of Individual A as a paid informant. Recca also reviewed police department rules regarding obtaining "John Doe" search warrants; these rules categorize such John Does as unregistered informants and prohibit compensating them

in return for information.

The affidavit then re-described, in greater detail, the source and Individual A's December 2017 meeting with Elizondo and Salgado regarding the purported stash house where narcotics could be located (actually an FBI-controlled apartment, as indicated earlier). Before the meeting, Individual A told the source that if they recovered enough cocaine in the search, the officers might give Individual A and the source some of it. During the meeting, Elizondo made statements that, the Court finds, reasonably could be interpreted as incriminating and did not disagree with or otherwise respond when Individual A told the source in the officers' presence that if drugs were recovered in the search, the officers would give some to Individual A and the source. As previously indicated, however, nothing of this sort actually resulted from the search, as the recovered cash was inventoried. Recca's affidavit recounted, however, that Salgado, who swore out the warrant, provided false information to a judge to get the warrant, specifically false attribution of certain statements to the source (the "J. Doe") that he had not made. During the execution of the warrant, there were several calls back and forth between Elizondo, using the target cell phone, and Individual A, who then asked the source to call Elizondo—which the source did, telling him where he believed the money was located inside the apartment. Recca's affidavit reported a call between the source and Elizondo several days later in which Elizondo advised the source that the apartment had video cameras and that the officers had inventoried the cash they had recovered. As indicated earlier, Elizondo made further statements on the call that, the Court finds, reasonably could be interpreted as incriminatory.

The affidavit summed up the probable cause showing by stating that based on

the following—

- Individual A's statements to the source that the officers he worked with had allowed him to keep narcotics from a prior controlled purchase;

- Individual A's statements on December 18 in Elizondo and Salgado's presence to the effect that the officers would give him and the source cocaine if they found any in the upcoming search;

- Elizondo's expressed willingness to give sources money recovered in searches rather than inventorying it; and

- Elizondo's use of his cell phone to communicate with sources including Individual A and the confidential source—

there was probable cause to believe that Elizondo and other officers were committing violations of the narcotics laws and that evidence of this would be obtained through an intercept of Elizondo's cell phone.

Recca further stated in his affidavit that based on the following—

- Salgado's presentation of false information and material omissions to obtain a warrant for the undercover apartment;

- the focus on recovering narcotics proceeds;

- the evidence of an intention to divert any such proceeds to confidential sources;

- the suggestion in one of Elizondo's statements that he and other officers might be stealing money from searches for themselves; and

- the transmission of interstate wire signals—

there was reason to believe that Elizondo and Salgado were engaged in a scheme to obtain money or property through false representations and that an intercept of

Elizondo's phone would uncover evidence of this. The representation about transmission of interstate wire signals was explained in a lengthy, small-type footnote. (The Court has expressed elsewhere, and repeats here, its concern with the United States Attorney's Office apparently routine practice of putting highly significant information in warrant and Title III applications into small-type footnotes, a practice that, at least in some situations, suggests an effort to minimize the information's significance or a hope that it will escape careful scrutiny. *See United States v. Novak*, No. 13 CR 312, 2015 WL 720970, at *17 (N.D. Ill. Feb. 18, 2015).)

The remainder of Recca's affidavit catalogued the number of contacts between Elizondo (using the target cell phone) and Individual A and between Salgado and Individual A and discussed the necessity for the requested interception. Recca also represented how interceptions would be minimized.

As stated earlier, Elizondo has moved to suppress the intercepted communications on the following grounds:

- The government's investigation actually involved violations of a statute that is not one for which Title III permits interception, and the citation of enumerated statutes (principally wire fraud and narcotics) was a subterfuge.

- The government's application omitted material information regarding the veracity of the informant whose statements served as a basis for the probable cause showing.

- The application did not make the requisite showing of necessity for intercepting telephone communications.

- Probable cause was lacking.

1.      **Enumerated statute**

A provision of Title III, 18 U.S.C. § 2516, lists the offenses that may serve as the predicate for an interception order. The listed offenses include the prohibitions against wire fraud, 18 U.S.C. § 1343, and various types of narcotics offenses, including 21 U.S.C. §§ 841, 843, and 846. The government cited each of these in its application for the interception order. But Elizondo has not been charged under any of those statutes or, for that matter, any other statutes listed in section 2516. Rather, he is charged with conspiracy to commit what is sometimes referred to as federal program theft/bribery under 18 U.S.C. § 666 and with theft of government property under 18 U.S.C. § 641, neither of which are among the statutes enumerated in section 2516.

Although Title III authorizes interception only where an enumerated offense is being investigated, it does not limit the use of intercepted communications to prosecutions involving enumerated offenses. The government may use intercepted communications to prosecute offenses not contained in the interception order if it meets the requirements of 18 U.S.C. § 2517(5), which states:

> When an investigative or law enforcement officer, while engaged in intercepting wire, oral, or electronic communications in the manner authorized herein, intercepts wire, oral, or electronic communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with provisions of the chapter. Such application shall be made as soon as practicable.

18 U.S.C. § 2517(5). The government sought and obtained a section 2517(5) order from Chief Judge Castillo, authorizing it to use the intercepted communications to

prosecute violations of statutes not specified in the Title III application or the interception order, including 18 U.S.C. § 371 (conspiracy) and 18 U.S.C. § 666 (federal program theft/bribery).

As the government acknowledges, section 2517(5) "is designed to prevent subterfuge searches"—in other words, naming one crime in the Title III application while "anticipat[ing] intercepting evidence of a different crime for which the prerequisites could not be satisfied." *United States v. Arnold*, 773 F.2d 823, 829 (7th Cir. 1985). It is reasonable to assume that the experienced prosecutors and agents involved in obtaining the Title III intercept order were aware that the evidence set out in the application implicated section 666, a non-enumerated offense. But the Court cannot say that their citation of the wire fraud and narcotics statutes amounted to a subterfuge.

First of all, the Title III application set out probable cause to believe that Elizondo had violated and likely would continue to violate the narcotics statutes the government cited, even if that may not have been the core of the scheme that the application described. Specifically, the application cited Individual A's statements to the government's source that officers he had worked with had let him keep narcotics obtained in a controlled buy and his statements to the source in Elizondo's presence that the officers would give them a cut of narcotics if any were found during the search.

Second, the application set out probable cause to believe that Elizondo had violated and likely would continue to violate the wire fraud statute, although this is a considerably closer question than the government suggests. To be sure, Recca's affidavit amply set out a scheme to obtain money or property by fraud. *See* Recca Affidavit ¶ 57 (summarizing the claimed probable cause involving wire fraud).

Specifically, the affidavit describes in detail an incident in which Salgado presented materially false information to a state court judge to obtain a search warrant for an apartment, with the goal that he and Elizondo would purloin—either for themselves or as "rewards" for their sources—the proceeds of narcotics transactions expected to be found in the apartment.[1]

Although the fraudulent information was presented to one person (a judge) in order to obtain money or property from another person (the apartment's occupant), the wire fraud statute does not require the person to whom the misrepresentation is made to be the same person whose money or property is taken. *See, e.g., United States v. Seidling*, 737 F.3d 1155, 1160-61 (7th Cir. 2013). The facts of *Seidling* are analogous to the scenario the government laid out in the warrant application. Specifically, the defendant in that case filed bogus complaints in small claims court, making misrepresentations to the court to obtain judgments against victims, and then used the judgments to obtain the victims' property. The court stated that "[a]lthough Seidling never directly communicated with the victims that owned the money or property he sought, he deceived the Wisconsin small claims courts in an effort to defraud the Individuals and one entity he named as defendants in the lawsuits." *Id.* at 1161. The court held that it was following the same approach as several other circuits that had rejected a "convergence" requirement for mail and wire fraud. *Id.* at 1161 n.2.

The point on which the probable cause showing for wire fraud comes closer to

_____

[1] Contrary to Elizondo's contention, the government provided a reasonable basis to believe that Elizondo was aware that Salgado presented false information to obtain the warrant and that this was part of a common scheme. This included, among other things, Elizondo's involvement in the events relating to the warrant and search that both preceded and followed the obtaining of the J. Doe warrant.

the line involves the element of use of an interstate wire transmission in furtherance of the scheme. *See* 18 U.S.C. § 1343. Recca's affidavit stated this in conclusory fashion in the main text, *see* Recca Affidavit ¶ 57(7), with the support found in a small-type footnote that stated the following:

> Likely interstate wire transmissions done in furtherance of the Subject Offenses include obtaining criminal background reports on confidential informants . . . for presentation to state court judges (as shown in Attachment A, the J. Doe warrant in this case states that the J. Doe's criminal history was made available to the judge). . . . Based on my training and experience, I know that it is routine for law enforcement officers running criminal background checks to pull reports from the National Crime Information Center (NCIC) database. Based on my conversations with other agents, I know that the NCIC database is maintained in West Virginia, and accessing the database from inside Illinois causes an interstate wire transmission. Therefore, to present a judge with misleading information in support of the December 19 warrant for the Subject Apartment, there is a fair probability that the Violators caused an interstate wire transmission.

*Id.* at 44-45 n.26.

It is highly probable that the agent who swore out the affidavit was just plain wrong about the likely use of an interstate wire communication. In fact, to obtain criminal background information on a Chicago informant, a Chicago police officer likely would use a locally-maintained database such as the one maintained by the Illinois State Police (called LEADS) or the one maintained by the Chicago Police Department itself (called CLEAR), not the national NCIC database. Use of one or even both of these Illinois-maintained databases, of course, would not involve an interstate wire transmission.

The government's application is saved in this regard, however, by the fact that certainty is not required, only probable cause. *See, e.g., United States v. Anton*, 633 F.2d 1252, 1254 (7th Cir. 1980) ("Probable cause denotes more than mere suspicion,

but does not require certainty.").  The agent's reliance on his own experience on this point, though arguably not all that relevant to how a Chicago police officer would carry out a similar task, is sufficient to clear the probable cause threshold.  *See, e.g., United States v. Howard*, 883 F.3d 703, 707 (7th Cir. 2018) ("In making a probable cause determination, 'a police officer may draw inferences based on his own experience . . . .'") (citing *Ornelas v. United States*, 517 U.S. 690, 700 (1996)).

Another potential issue regarding the application's reliance on the wire fraud statute involves the fact that the affidavit's summary of the evidence supporting probable cause, *see* Recca Affidavit ¶ 57, focuses primarily on a single incident that had occurred several weeks before the Title III application was submitted.  At the time the application was submitted, it was highly unlikely that Elizondo would be having further conversations via his cell phone regarding that particular incident.  Thus if all the application had cited was the single incident, probable cause to believe that an interception would turn up evidence likely would have been lacking (or at least the showing would have been far thinner), making it far more likely that the reliance on the wire fraud statute was a subterfuge.  But the detailed description of the evidence the government had uncovered, found earlier in Recca's affidavit, supported the proposition that Elizondo and Salgado were carrying out an ongoing scheme, such that it was reasonably likely that they would engage in similar illegal activity in the future.

In short, the Title III application legitimately relied on alleged violations of the narcotics laws and the wire fraud statute to support probable cause and did not simply use these as a subterfuge to obtain evidence regarding conduct violative of a non-enumerated statute.  The Court overrules Elizondo's subterfuge argument.

**2.  Information regarding the informant**

Elizondo contends that the government failed to disclose that Individual A, whose information was relayed to the investigators' confidential source, who in turn relayed it to the investigating agents, had previously been arrested by Elizondo when he was employed as an FBI task force officer.  Individual A was sentenced to a significant prison term as a result of that arrest.  This, Elizondo argues, gave Individual A a significant motive to falsify information about Elizondo.

Although the warrant application disclosed Individual A's conviction, it did not disclose the fact that Elizondo was the arresting officer.  Elizondo says that he "was the officer who brought [Individual A] to the attention of federal agents" and that it was "[a]s a result of Elizondo's work" that Individual A was convicted and sent to prison for over eight years.  Def.'s Mot. at 7.  Elizondo also contends that although agent Recca's affidavit states that Individual A told the informant that he had first met the Chicago police officers he was working with when they had recently searched his home and found nothing, in fact "the FBI knew that [Individual A] had met Elizondo nearly a decade prior."  *Id.*

Elizondo's contention that the warrant application omitted relevant information and contained a falsehood invokes *Franks v. Delaware*, 438 U.S. 154 (1978).  Under *Franks*, a warrant or, here, a wiretap order, is invalid if it was "obtained by the government's deliberate or reckless omission of material information from its application."  *United States v. Mandell*, 833 F.3d 816, 823 (7th Cir. 2016).  Elizondo is entitled to an evidentiary hearing on the validity of the order authorizing the wiretap if he makes a "substantial preliminary showing" that law enforcement secured the order with

deliberate or reckless misrepresentations that were necessary to the issuing judge's finding of probable cause. *See id.*; *see also, e.g., United States v. McMurtrey*, 704 F.3d 502, 508 (7th Cir. 2013). "Allegations of negligent or innocent mistakes do not entitle a defendant to a hearing, nor do conclusory allegations of deliberately or recklessly false information." *United States v. Santiago*, 905 F.3d 1013, 1025 (7th Cir. 2018) (quoting *McMurtrey*, 704 F.3d at 509). And "if probable cause to issue the warrant would still exist even if the false statement or material omission were corrected, then no *Franks* hearing is required." *Santiago*, 905 F.3d at 1025 (quoting *United States v. Carmel*, 548 F.3d 571, 577 (7th Cir. 2008)).

Elizondo has not made the necessary showing. Agent Recca, the government's affiant, did not join the FBI until several years after Individual A's 2008 arrest and prosecution. Elizondo offers nothing to suggest that Recca was aware of any involvement by Elizondo in the earlier case involving Individual A.[2] There is no evidence that any of the other agents involved in the Elizondo/Santiago investigation were aware of Elizondo's involvement in Individual A's earlier arrest or prosecution or that Individual A told any of the agents about this. Elizondo says only that "the FBI knew" of his involvement. Assuming that Elizondo's motion accurately states his role in the earlier arrest and prosecution of Individual A,[3] then it is certainly likely that *someone*

---

[2] Recca stated in his affidavit that a search of FBI records indicated that Elizondo had served as an FBI task force officer from 2007 through 2011 and that Recca had learned, through "discussions with other FBI agents," that Elizondo had occasionally worked with FBI agents after that time. None of this, however, indicates that Recca was aware of or was reckless in failing to learn of Elizondo's prior dealings with Individual A.

[3] The government contends that Elizondo's involvement in Individual A's earlier arrest and prosecution was not as significant as he represents in this motion, but the Court need not resolve that dispute to decide the present motion.

with the FBI knew this.  But there is no evidence indicating, for example, that any of the agents involved in the earlier matter had any involvement, let alone significant involvement, in the present Elizondo/Santiago investigation or that information or records regarding Elizondo's involvement in the earlier matter involving Individual A were so readily available to the investigating agents that their failure to find them was reckless.  In short, the element of intent or recklessness is missing.

### 3.    Necessity

Title III contains what is commonly referred to as a "necessity" requirement, which requires a judge, before approving an intercept application to find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(3)(c).  This requirement is intended to ensure that wiretaps "are not . . . routinely employed as the initial step in a criminal investigation," not that they "are used only as a last resort." *Mandell*, 833 F.3d at 821.  The government is not required to show that it would be impossible to make a case without evidence from interception or that evidence sufficient to obtain charges cannot be obtained via other means.  *See United States v. McLee*, 436 F.3d 751, 762-63 (7th Cir. 2006).

Judge Castillo did not abuse his discretion (the applicable standard at this point, *see id.* at 763) in determining that the application met this requirement.  The application contained an ample showing that physical surveillance was unlikely to yield useful evidence because those being investigated were law enforcement officers whose training and experience likely would enable them to detect surveillance, and because a good deal of the evidence—for example, evidence regarding thefts during searches and

causing others to make false statements—would not be discernable via surveillance. Other forms of electronic analysis, such as pen registers, trap and trace, and analysis of phone records, would have limited evidentiary value in establishing a conspiracy. The government was using an informant, but there was a reasonable showing that he unlikely would be able to gather information on any apparent participant other than Elizondo, his contact. And the government represented that it did not have enough evidence to obtain a warrant to search any particular location, not to mention that doing so would expose the investigation's existence. Interviewing or subpoenaing witnesses similarly would expose the investigation and likely would result in alleged participants declining to provide information and little useful information from others. Finally, it was highly unlikely that the investigators would be able to place an undercover agent who would be able to gain the alleged conspirators' trust within a reasonable period of time. Contrary to Elizondo's contention, the application was anything but conclusory along these lines. The government *had* used standard investigative procedures, but they advanced the investigation only so far. Judge Castillo did not abuse his discretion in determining that the government had sufficiently shown both that normal investigative procedures had been tried and that further activity along the same lines reasonably appeared to be unlikely to succeed.

**4.      Probable cause**

Elizondo also contends that the warrant application did not establish probable cause to believe that intercepting his phone communications would produce evidence of the asserted crimes. His argument in this regard appears to be based, at least in part, on a contention that material information was omitted that would have enabled Judge

Castillo to put the facts asserted in what Elizondo argues was their proper context. To this extent at least, Elizondo's probable cause argument implicates *Franks*.

Under Title III, as relevant here, the judge reviewing the intercept application must determine that there is probable cause to believe a person has committed, is committing, or is about to commit an enumerated offense and that there is probable cause to believe that communications concerning that offense will be obtained through the requested interception. 18 U.S.C. § 2518(3)(a), (b).

Elizondo's argument about probable cause traces back to his work on an FBI task force. His role, he says, was to pose as a police officer on the take. He would tell targets of the task force's investigatory activity that he would get time off work for recovering firearms and would sell narcotics seized from target locations to a street gang and keep the money. Elizondo says that from 2008 to 2010, he was involved in the investigation and apprehension of Individual A during his work on the task force, and he provides documentation that he participated in at least one "proffer" interview session involving Individual A.

Fast forwarding to the events at issue, Elizondo says that in October 2017, Chicago police obtained a search warrant targeting Individual A. He learned this and told "the affiant officer" that he recognized Individual A's name, and upon seeing a photo confirmed that this was the same person he had investigated year earlier. On October 6, Elizondo participated with others in executing the search warrant. While other officers searched the premises, Elizondo says, he pulled Individual A aside and asked if Individual A remembered him. Individual A confirmed that he did and said he recalled Elizondo had "locked [him] up." Elizondo says he told Individual A that he was still

working with the FBI, knew that Individual A had a lot of knowledge, and was aware that the FBI pays for information. Individual A replied that he was not sure he wanted to work with the FBI again. Elizondo says that he gave Individual A his name and cell phone number and told him to call. According to Elizondo, Individual A provided his contact information to "the affiant officer," and a few weeks later the FBI registered Individual A as an informant. (This last point was confirmed in agent Recca's affidavit. *See* Recca Affidavit at 27 n.12.)

In December 2017, the FBI planted cash inside an apartment. Salgado obtained a search warrant for the apartment, and Elizondo participated in the search. Elizondo says that the cash was found with the assistance of Individual A, and it was inventoried. A week later, Elizondo says, he told Individual A that the money had been inventoried and that it would have been "a good Christmas" for everyone had it been diverted. In January 2018, the FBI planted cash in a car trunk in a hotel parking lot. The Title III wiretap authorization was issued on January 24, 2018. On January 28, Elizondo and his team searched the car and, with Individual A's assistance, found the cash. Elizondo says he was able to identify the hotel room with which the car was associated and searched it too, looking for contraband. He says that Salgado inventoried the cash found in the car trunk.

According to Elizondo, his statement to Individual A about the potential for diverting money (the "good Christmas" statement) was nothing more than a carrot that he was dangling in front of Individual A, a potential informant, in the hope of inducing him to provide more information. Elizondo argues that if the government had fully disclosed in its Title III application Elizondo's prior work with the FBI and the training he

got about deceiving potential informants, it would have put the matters set forth in the application in a different, non-inculpatory light.

Elizondo also argues that there is nothing in the warrant application indicating that he participated in the preparation of the allegedly false search warrant application presented by Salgado to a state court judge to obtain the December 2017 warrant. He argues: "No reasonable inference can be made that because Elizondo met with [the government's confidential source] and participated in the December 20, 2017 search, Elizondo must have participated in the presentation of the false J. Doe warrant on December 19, 2017." Def.'s Reply at 7-8.

Elizondo acknowledges in his reply brief that "possibly innocent explanations do not vitiate probable cause." *Id.* at 8. That is correct, and it essentially defeats Elizondo's argument. An inculpatory interpretation of the events described in the affidavit—in other words, the interpretation the government offered at the time—is certainly reasonable. *See United States v. Malin*, 908 F.2d 163, 166 (7th Cir. 1990) (citing *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985)); *United States v. Dorfman*, 542 F. Supp. 345, 359 (N.D. Ill. 1982) ("[D]efendants' position . . . that the presence of innocent explanations for much of the information presented in the applications . . . vitiates the warrants, must be rejected. Even if there is an innocent explanation, as long as there is a reasonable probability that there is criminal activity afoot, despite the presence of other possibilities, probable cause is present."), *aff'd sub nom. United States v. Williams*, 737 F.2d 594 (7th Cir. 1984).

Elizondo argues, however, that Judge Castillo, in issuing the intercept order, could not appropriately determine whether probable cause existed "when material

information, namely that Elizondo was taught to make promises he had no intention of keeping, is withheld." Def.'s Reply at 8. And he contends that absent evidence that he participated in the presentation of the false warrant application to the state court judge, the application has no bearing on the analysis of probable cause.

The proposition that police officers sometimes lead informants along (or mislead them along), however, does not establish that is what Elizondo was doing in this situation. And the omission from the warrant application of information that might suggest an alternative interpretation of Elizondo's actions as described in the application was not material. Law enforcement may not ignore "conclusively established" evidence that defeats probable cause, *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009), or "clearly exculpatory facts," *Stokes v. Board of Education of City of Chicago*, 599 F.3d 617, 624 (7th Cir. 2010), but the material that Elizondo cites does not fall within either of these categories. Again, the fact that Elizondo in particular, and law enforcement officers generally, may sometimes make false promises to obtain information sheds no significant light on whether that was what was happening here.[4] In sum, the omission cited by Elizondo was immaterial.

## Conclusion

For the reasons stated above, the Court denies defendant Elizondo's motion to suppress [23].

Date: February 22, 2019

_____
MATTHEW F. KENNELLY
United States District Judge

---

[4] That aside, it is beyond question that Chief Judge Castillo, an experienced and savvy judge and former prosecutor, is and was fully aware of standard law enforcement tactics—including how officers deal with informants—even if those details were not spelled out in black and white in the Title III application.