UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>XAVIER ELIZONDO, aka "X," and DAVID SALGADO | No. 18 CR 286<br><br>Judge Matthew F. Kennelly |

**GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS IN LIMINE**

The UNITED STATES OF AMERICA, through JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits its consolidated motions *in limine.*

**I.  DISCLOSURE OF RULE 404(b) AND 608(b) EVIDENCE**

Both defendants' have moved for the government to disclose any Rule 404(b) evidence it intends to offer at trial. Defendant Elizondo also moves for the government to disclose any Rule 608(b) evidence it may use to impeach Elizondo if he decides to testify.

The government does not intend to offer Rule 404(b) evidence at trial. The Court should deny defendants' 404(b) motion as moot.

As for 608(b) evidence, it is well-established law that 608(b) material that does not fall under Rule 16, and does not constitute 404(b) evidence, is not discoverable. *United States v. Hartmann*, 958 F.2d 774, 789 n. 5 (7th Cir. 1992); *United States v. Beshey et al.*, No. 17 CR 643 (N.D. Ill. Jan. 22, 2019); *United States v. Lim*, No. 99 CR 689, 2000 WL 782964, at *2 (N.D. Ill. June 15, 2000. Again, the government has

satisfied its Rule 16 obligations, so the Court should deny defendant Elizondo's motion for disclosure of Rule 608(b) evidence on the merits.

As the Court knows, the government has asked that all parties be required to obtain preclearance from the Court outside the presence of the jury before attempting to impeach with Rule 608(b) evidence, to ensure that the conduct at issue goes to truthfulness, and that there is a sufficient good faith basis to inquire. The government's proposal is sufficient to prevent any unfair surprises.

## II. PRECLUSION OF "CERTAIN EVIDENCE"

Defendant Elizondo has moved the Court to preclude several specific categories of evidence. Below is the government's response to each category contained in defendant's motion:

- **Evidence of theft during searches**:

The charged conspiracies in this case include stealing cash during searches. As the Court knows, the government will present evidence that the defendants stole $4,200 that they recovered inside a vehicle on January 28, 2018 during the FBI's second undercover ruse operation. The government will also present evidence that the defendants had detailed conversations about stealing money that they anticipated recovering during the first undercover search on December 20, 2017, but ultimately changed course and inventoried all funds found during the search when they discovered they were under surveillance.

The government also has several witnesses who will testify that the defendants' CPD unit searched their residences in late 2017 or early 2018, and that

2


cash was present inside the homes immediately before the searches but gone after. The government will show through witness testimony and search warrant inventory reports that the officers involved in these searches did not inventory any money.

Defendant Elizondo moves this Court to bar admission of testimony from witnesses whose residences the defendants' CPD unit searched, and who would testify that there was money in the residences before the searches occurred and gone after (and not inventoried). According to Elizondo, these witnesses' testimony is inadmissible because it is uncorroborated. Defendant's argument fails. First, that the defendants were engaged in theft of funds from search locations is strongly corroborated by both undercover operations, as well as Witness 2, who the government expects will testify that Elizondo, in Salgado's presence, made cash payments to him/her from money that Elizondo said was recovered from search locations.  Second, even if a witness's testimony was uncorroborated as to money being there before the search and gone after, that would not preclude the testimony, as defendant argues. It is for the jury to determine if the witnesses are credible on this point—that is what trials are for.

The government agrees that, to establish the relevance of missing funds evidence, it will have to offer some particularized proof to link the defendants to the missing funds, such as means, motive, and opportunity evidence, or relevant statements made by the defendant. Due to the fact-intensive nature of this issue, the government respectfully suggests it is better to defer ruling until trial, when the Court can make a case-by-case determination as to whether the government has

3

sufficiently established the relevance of individual instances of "missing funds" evidence. Accordingly, the government will not elicit testimony regarding missing funds from search locations (with the exception of the evidence obtained from the undercover operations), until obtaining preclearance from the Court.

- **Evidence of Compensating Confidential Sources with Money and Cigarettes**: The government intends to offer evidence that Elizondo and Salgado compensated informants with cigarettes that they stole during a search of a residence. The government will not offer evidence that either defendant compensated informants with cigarettes not stolen from search locations.

The government, however, does intend to offer evidence that Elizondo regularly made undocumented cash payments to his informants, which included cash not necessarily stolen for search locations. The government will offer evidence that it is against CPD policy and procedure for patrol officers such as Elizondo to pay informants, and that all paid informants must be registered with the Bureau of Organized Crime, which Elizondo did not do with his informants.

This evidence is relevant to the conspiracy charged in Count One for several reasons. First, Elizondo's failure to register his sources per CPD policy is circumstantial evidence of his intent to conceal his activities with his sources, and to prevent other CPD officers from knowing about the sources and having access to them. Second, the government's proof at trial will establish that Elizondo made regular, undocumented cash payments to his sources—again, against CPD policy—for purposes of cultivating loyalty, so that the sources would commit unlawful acts

4

for him (lying to judges), and so the sources would not expose his illegal activity to judges or other police officers.

There is little risk that the jury will confuse or equate violation of CPD administrative polices with violation of federal law. Any potential risk of confusion is easily curable with a jury instruction.

- **"Any Evidence that any Acts Performed Outside of CPD Policy Were Illegal":** The government understands this to be a motion to preclude the government from arguing that because an act violated CPD policy, it necessarily was illegal. The government, of course, will not argue that. As explained above, any evidence of the defendants' deviation from CPD policy (including search procedures and registering and paying informants) is offered solely as evidence of defendants' efforts to conceal the Count One conspiracy.

- "**Any Testimony or Argument that a General Fear of Police is an Excuse for a Witness Changing His or Her Version of Events at Trial From Earlier Statements Provided to Investigators":** The government understands this to mean that, in the event a witness's trial testimony inculpates Elizondo to a greater degree than any prior statements the witness may have made to law enforcement, the Court should bar the witness from explaining that s/he did not provide the full story initially due to a fear of law enforcement. The government has no reason to believe that this will occur at trial. In the event it does, however, the Court should allow the government—subject to Rule 403 balancing—to elicit an

5

explanation from the witness regarding the reasons for discrepancies between statements.

Fronting potentially impeaching information, including prior inconsistent statements, to "draw the sting" from cross-examination is commonplace and widely accepted. As the Seventh Circuit has explained:

> The practice is justified by the same considerations that underlie the "completeness" rule codified in Fed.R.Evid. 106. A party ought to be able to extract the complete testimony of his witness, including the essential circumstances bearing on its believability, rather than forced to leave gaping holes to be poked at by his opponent. . . . A trial is not just combat; it is also truth-seeking; and each party is entitled to place its case before the jury at one time in an orderly, measured, and balanced fashion, and thus spare the jury from having to deal with bombshells later on. It is on this theory that defense counsel, in beginning their examination of a defendant, will often ask him about his criminal record, knowing that if they do not ask, the prosecutor will do so on cross-examination. . . . What is sauce for the goose is sauce for the gander.

*United States v. LeFevour*, 798 F.2s 977, 983-84 (7th Cir. 1986).

A jury is entitled to hear a witness explain why they did not tell the truth the first time they were questioned, including that they were afraid, so long as the testimony satisfies Rule 403 balancing. *See United States v. Thomas*, 86 F.3d 647, 654 (7th Cir. 2004) ("threat evidence can be relevant to explain a witness' inconsistent statements, delays in testifying, or even courtroom demeanor indicating intimidation").

Defendant has not bothered to develop this argument, and the Court cannot make a ruling with no relevant facts before it. In the event this comes up at trial, however, Rule 403 balancing governs the admissibility of "fear" testimony to explain a prior inconsistent statement. *Thomas*, 86 F.3d at 654.

- **"Any Testimony that Elizondo use Profanity . . . Physical Abuse of Unlawful Restraint of Citizens, or Promised to Help Informants with Future Cases":** The government does not intend to introduce evidence that Elizondo used profanity with or physically abused citizens. However, the government may seek to offer evidence that the defendants promised to help arrestees with potential criminal charges if the arrestees agreed to act as J. Doe informants for the defendants. Specifically, the government will present evidence that during the execution of a J. Doe search warrant in October 2017, Elizondo's unit recovered a large quantity of ecstasy pills, two firearms, and other items inside a residence at which Witness 4 was present. The government will present further evidence that, during the search, Elizondo and Salgado interviewed Witness 4, and s/he denied knowledge of the ecstasy pills and the two firearms. Despite Witness 4's denials, the government will show that Salgado drafted, and Elizondo approved, a materially false arrest report that stated Witness 4 admitted to possessing the ecstasy pills and the two firearms. The government will present further evidence that Elizondo and Salgado then told Witness 4 they could make the charges "go away" if Witness 4 acted as an informant for them.

The above is direct evidence of the Count One conspiracy (the falsification of police reports is specifically listed in paragraph 7 of Count One as a manner and means of the charged conspiracy). The incident listed above carries substantial probative weight. First, it demonstrates that, as part of the conspiracy, Elizondo and Salgado falsified reports for purposes of gaining leverage over citizens in an effort to

7

recruit them as J. Doe affiants/confidential sources. Second, it shows that Elizondo and Salgado deliberately took steps to impair the credibility of citizens who might later come forward and accuse the defendants of stealing their property. For example, at trial Witness 4 will be subject to a bias cross since Elizondo and Salgado arrested him/her and falsely reported that the seized property belonged to Witness 4, and a prior inconsistent statement cross since Witness 4 will deny making the admissions documented in the police report of the search.

This evidence is of course prejudicial to the defendants, as all relevant evidence is. *See United States v. Puckett*, 405 F.3d 589, at 598 (7th Cir. 2005). The question is whether the evidence gives rise to a risk of "unfair" prejudice—meaning evidence that "induces the jury to decide the case on an improper basis, commonly an emotional one"—and whether that risk substantially outweighs the probative value of the evidence. *Id.* at 598. Here, the probative value is strong; it is an important example of the manner and means of the conspiracy. The risk of unfair prejudice, by contrast, is minimal. The jury is hardly likely to be inflamed by dueling testimonial accounts of statements made by an arrestee.

### III. PRECLUSION OF OPINION EVIDENCE

Defendant Elizondo moves to preclude Officers Joe Treacy and Jose Sanchez from testifying that, on the evening of January 29, 2018, shortly after Elizondo learned that his unit was under investigation, he appeared nervous. According to defendant, this constitutes inadmissible opinion evidence regarding the defendant's state of mind. Defendant is mistaken. Firsthand testimony that someone "appeared

8

nervous"—if premised on sufficient facts—is permissible lay witness perception testimony under Rule 701. *See, e.g., United States v. Gyamfi*, 805 F.3d 668, 672-73 (6th Cir. 2015).

Fed. R. Evid. 701 provides that a lay witness may offer opinion testimony when it is: (1) rationally based on the witness's perception; (2) helpful to clearly understanding the witness's testimony or determining a fact in issue; and (3) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Courts have consistently held that it is appropriate Rule 701 testimony for an eyewitness to testify that someone appeared nervous so long as there is sufficient factual foundation. *Gyamfi*, 805 F.3d at 672-73 (permitting under Rule 701 police officer testimony that defendant appeared nervous during interrogation); *United States v. Mastberg*, 503 F.2d 465, 470 (9th Cir. 1974) (permitting under Rule 701 the testimony of a customs inspector that the defendant appeared nervous).

Here, there is plenty of factual foundation to support Officer Treacy and Sanchez's first-hand observations that Elizondo appeared nervous on the evening of January 29, 2018. For example, the witnesses will testify that Elizondo had turned pale, was speaking in a rambling and confused manner, and that his voice was trembling. *See Gyamfi*, 805 F.3d at 673. Officer Treacy will also testify that he observed Elizondo retching or dry heaving into a sink when he learned that the FBI was executing a search warrant at Salgado's home. This provides a more than adequate foundation to support the officers' testimony.

9

Obviously, the government will not elicit foundationless hearsay that a witness "heard" Elizondo's unit was corrupt. However, if either defendants seeks to offer evidence of a pertinent character trait, the government may seek to rebut it in accordance with Fed. R. Evid. 404(a)(2)(A), which may include reputation or opinion evidence, or inquiry on cross regarding relevant specific instances of the defendants' conduct. Fed. R. Evid. 405.

### IV.  LAW ENFORCEMENT POLICY COMPARISON EVIDENCE

The government agrees that the FBI's investigative polices are not relevant to this case, and the government does not plan to present any evidence of FBI polices as part of its case-in-chief. However, the government has reason to believe the defendant might open the door to such evidence by putting on a defense in which he testifies or otherwise presents evidence that, while working as an FBI TFO, the FBI trained the defendant to "bluff" informants by promising to pay them but no actually following through. If the defendant opens the door in such a manner, the government may seek to offer evidence of pertinent FBI policy to rebut the evidence.

### V.  ALLOWING HEARSAY TO REBUT A RECENT FABRICATION

Defendant Elizondo moves this Court to allow him to introduce recorded telephone conversations between Elizondo and current or former CPD officers that took place shortly after Elizondo learned he was under criminal investigation. In the conversations, Elizondo tells the other parties that he has not done anything wrong. According to defendant, these conversations are admissible under Rule 801(d)(1)(B)

10

as evidence of a prior consistent statement offered to rebut an express or implied charge that defendant recently fabricated his testimony.

Not so. Prior consistent statements are admissible under Rule 801(d)(1)(B) only if they occurred before the motive to fabricate arose. *See United States v. Davis*, 896 F.3d 784, 788 (7th Cir. 2018); *citing United States v. Tome*, 513 U.S. 150, 156-60 (1996). Here, the motive to fabricate arose at the time Elizondo first learned he was under investigation. This occurred at approximately 5 p.m. on January 29, 2018, when Salgado called Elizondo and told him that CPD's Internal Affairs had just towed the vehicle they searched the prior evening. In response, Elizondo stated, "Alright, well, you know what to do right? Just relocate everything."

As such, Elizondo should not be allowed to introduce any out-of-court statements pursuant to Rule 801(d)(1)(B) that occurred after the phone call described above.

## VI. GAMBLING EVIDENCE

The government does not intend to introduce evidence related to Super Bowl squares.

                Respectfully submitted,
                JOHN R. LAUSCH, JR.
                United States Attorney

By:    */s/ Sean Franzblau*
                SEAN J.B. FRANZBLAU
                ANKUR SRIVASTAVA
                Assistant United States Attorneys
                219 S. Dearborn Street
                Chicago, Illinois 60604
                (312) 353–5300